## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

MCQUEEN,  RAINS & TRESCH,        )
LLP,                             )
                                 )
            Plaintiff,           )
                                 )
v.                               )        Case No. 07-CV-0314-CVE-PJC
                                 )
CITGO PETROLEUM CORPORATION,     )
                                 )
            Defendant.           )

## OPINION AND ORDER

Now before the Court is CITGO Petroleum Corporation's Motion for Judgment on the

Pleadings and Memorandum in Support (Dkt. # 30).  Defendant CITGO Petroleum Corporation

("CITGO") seeks judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons set

forth below, the Court finds that defendant's motion, as well as the motions for summary judgment,

should be held in abeyance.

## I.  Background

The instant civil action arises from the alleged breach of three fixed fee, fixed term, retainer

agreements between the law firm, McQueen, Rains & Tresch, LLP ("MRT"), and its client, CITGO.

See Dkt. # 2.  On August 3, 2004, the parties executed a letter retainer agreement entitled

"Engagement" (hereinafter "Original Engagement Agreement").  See Dkt. # 36, at 16-21.  In

December 2004, the parties executed two additional retainer agreements pertaining to environmental

representation and litigation management services (hereinafter "Supplemental Engagement

Agreements").  See id. at 25, 28.  On February 2, 2005, the parties amended these retainer

agreements (hereinafter "Amended Engagement Agreement" and "Amended Supplemental

Engagement Agreements"). Id. at 31, 41, 45. These latter agreements form the basis of MRT's

claim.

The Amended Engagement Agreement provided for the "handling of certain legal matters

on a fixed fee basis during the [four-year] period of the engagement, . . . beginning September 1,

2004 and ending August 31, 2008 (the "Initial Term") . . . ." Id. at 31. The Amended Engagement

Agreement defined the scope of services as including: (1) "counseling and contract review" for over

twenty CITGO client groups, id. at 32;  (2) responsibility "for administering and paying outside

counsel fees" for specified routine litigation, id.; (3) managing "employment litigation for Houston,

Lemont, and CARCO," except that MRT would "not be responsible for payment of attorney fees

for local counsel of such litigation," id. at 33; (4) "maintain[ing] an office in the Houston

headquarters of CITGO and [] hav[ing] an attorney available there during the work week," id.; and

(5) providing additional legal services "for special projects or assignments outside the scope of this

arrangement at rates set out" in an attached exhibit, plus expenses, id.  For these services, CITGO

agreed to pay MRT $7.5 million per year, which was to be paid monthly in the amount of $625,000.

Id. at 34.  The parties agreed that the fixed fee was "based on an evaluation of anticipated costs of

current CITGO litigation and anticipated new litigation arising in the ordinary course of business

during" the contractual period.  Id.  Each quarter, MRT was to "provide a 'raw' time report

reflecting time devoted to each operating group or client."  Id.  The Amended Engagement

Agreement further provided that if the actual litigation and related legal services differed

"significantly more or less than contemplated, then the parties agree[d] to adjust the fixed fee or

handle such matter(s) outside this agreement, as appropriate."[1]  Id.  The fixed fee was based, in part, "upon representations of third-party law firms that they w[ould] assist [MRT] with CITGO matters on a fixed fee basis."  Id.  As to billing, the Amended Engagement Agreement provided that "[o]n or before the first day of each month," MRT would bill CITGO "for 1/12th of the fixed fee ($625,000) for that month."  Id. at 35.

Under the Amended Supplemental Engagement Agreements, which incorporated by reference the terms and conditions of the Amended Engagement Agreement, id. at 42, MRT was to "provide legal counseling, advice and assistance to CITGO's employees, management and outside counsel relating to routine environmental matters other than litigation and administrative contested proceedings ("Environmental Advice")," id. at 41.  MRT was also to "provide direct and indirect administrative and management services, general legal advice and consultation in connection with all litigation matters . . . in which CITGO is represented by outside counsel other than MRT (the "Litigation Management Services")."  Id. at 45.  These Amended Supplemental Engagement Agreements became effective January 1, 2005 and were to expire December 31, 2008.  Id. at 41, 45. Under the terms of these agreements, CITGO agreed to pay MRT annual amounts of $500,000 and $450,000 respectively, in equal monthly installments.  See id.  As to billing, the parties agreed that "on or before the first day of each month, MRT w[ould] bill CITGO for the monthly amount due (subject to adjustment) for that month."  Id. at 42, 46.

CITGO does not dispute that it prematurely terminated the Amended Engagement Agreement and Supplement Engagement Agreements.  See Dkt. # 30, at 1.  The parties do dispute,

---

[1]      Additionally, the parties agreed to automatically adjust the fixed fee each December to correspond with increases in the annual rate of inflation.  Id.

however, whether this termination was excusable in light of MRT's performance.  According to

MRT, CITGO discharged the firm without cause when, "on April 5, 2007, CITGO sent MRT a letter

notifying MRT that CITGO was terminating its relationship." Dkt. # 59, at 4.  MRT does not seek

recovery for services performed prior to this termination, but instead claims that CITGO owes the

firm "termination payments [as] required by the liquidated damages clauses" in the Agreements.[2]

Dkt. # 37, at 2.  The liquidated damages clauses, nearly identical, state:

> CITGO acknowledges that in reliance on this [Agreement], the Firm [MRT] has
> undertaken and continues to undertake costs and expenses to provide optimal legal
> representation to CITGO and acknowledges that a premature termination of this
> [Agreement] would result in losses and damages to the firm that may be impossible
> to quantify.  Consequently, in the event CITGO terminates this [Agreement] prior to
> the end of the Initial term, CITGO will pay the Firm, as liquidated damages, the lesser
> of all monthly installments for the Initial Term remaining under the contract or 12
> months of installments, in lieu of other direct, indirect or consequential damages.
> Such liquidated damages will be due and payable within 30 days after termination of
> this [Agreement].

Dkt. # 2, at 2-3; Dkt. # 36, at 35, 42, 46.  In other words, the parties agreed that if CITGO

prematurely terminated its attorney-client relationship with MRT, CITGO would pay up to twelve

monthly installments of each fixed fee in lieu of other direct, indirect, or consequential damages.

The parties have stipulated that the issues in this case are governed by Oklahoma law.  See Dkt. #

16, Joint Status Report, at 3.

CITGO now moves for judgment on the pleadings on the ground that MRT's breach of

contract claim fails as a matter of Oklahoma law.  According to CITGO, a discharged law firm

cannot enforce liquidated damages clauses against its former client, because the fees represented by

the liquidated damages have not been earned.  See Dkt. # 41.  According to MRT, it may enforce

---

[2]      CITGO states that this amount is in excess of $4.6 million dollars.  Dkt. # 30, at 1.

the liquidated damages clauses because a law firm, which detrimentally relies on a fixed term, fixed fee, general retainer agreement and which is discharged by the client without reasonable cause, may collect damages for the loss of fees provided in the contract. Dkt. # 37, at 3. Thus, the issue before the Court is whether Oklahoma law allows a prematurely discharged law firm to collect as liquidated damages a portion of a total fixed fee not yet received (or earned) by the firm.

## II. Analysis

Generally, Oklahoma law allows non-penal, liquidated damages provisions in contracts. See OKLA. STAT. tit. 15, § 215(A) ("A stipulation or condition in a contract . . . providing for the payment of any amount which shall be presumed to be the amount of damage sustained by a breach of such contract, shall be held valid, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."); see also id. § 213 ("[P]enalties imposed by contract for any nonperformance thereof, are void."). A contract for legal services between a lawyer and a client is not an ordinary contract, however, because of the fiduciary nature of the relationship. The type of contract at issue here is commonly known as a retainer agreement.

### A. Retainer Agreements

There are three primary types of retainer agreements. Under an availability or general retainer, the client pays a fee in advance to assure the attorney's availability. Topic: Non-refundable Retainer Agreements, OK Adv. Op. 317 (Dec. 13, 2002), available at 2002 WL 31990267, at *1. "The attorney earns this kind of 'retainer' by agreeing to be available, regardless of whether any actual services must be performed." Id. A fee paid in advance for this purpose is generally considered "earned" upon receipt by the attorney. Id. at *2. The Oklahoma Bar Association has found that the attorney is charged with the responsibility of drafting "the fee contract clearly and

concisely to ensure that the client understands the fee paid in advance is intended to guarantee the attorney's availability and is not intended to pay for future services." Id.

A fixed or flat fee retainer, on the other hand, is intended to cover the entire cost of a specific task or matter. Id. "Fees paid in advance for this purpose are intended to cover a specified amount of work estimated by the attorney for a particular matter. The attorney usually does not receive any additional fee even if more work is required, unless specifically agreed to by the client." Id. The Oklahoma Bar Association has noted that "[a] number of jurisdictions that have addressed flat fees determined they are earned when paid . . . ." Id.

Under an hourly fee retainer, a client tenders an advance payment as compensation for hours of legal services that the attorney will perform in the future. Id. at *3. The Oklahoma Bar Association has found that "[t]hese fees may be designated 'minimum,' 'fixed' or 'hourly' fees, but cannot impair the client's rights under Rule 1.16(d)." Id. The courts of several states, including Oklahoma, have found that if an attorney withdraws from a case, or is terminated before completing the work, the unearned portion of the hourly retainer must be refunded. Id.; see discussion infra Part II.B.4.

Notwithstanding these classifications, a retainer agreement may qualify as a "hybrid," or a combination of two or more of the above types. Lester Brickman & Lawrence A. Cunningham, Nonrefundable Retainers Revisited, 72 N.C. L. Rev. 1, 26 (1993). In a hybrid retainer, the primary distinction between availability of the attorney and performance of services "becomes less clear-cut." Id. No longer can one necessarily discern whether the payment is for the attorney's general availability, as in a general retainer, or whether the payment is for the attorney's services, as in an hourly or a fixed fee agreement.

In this case, the MRT retainer agreements qualify as hybrids. CITGO agreed to pay MRT annual fixed fees in exchange for MRT's availability and performance of legal services in certain matters for a four year period. Instead of paying these annual fees upfront, however, CITGO agreed to pay MRT 1/12th of the yearly fixed fee under each agreement at the beginning of each month. Each quarter, MRT was to provide a "raw" time report reflecting time devoted to each operating group or client. The parties further agreed that if the actual litigation and related legal services differed significantly more or less than contemplated, the annual fixed fee would be adjusted or such matters would be handled outside of the retainer agreements.

B.  Enforceability of the Liquidated Damages Provisions

The Oklahoma Supreme Court has not addressed the question of whether a prematurely discharged law firm is entitled to liquidated damages, which in this case would amount to twelve months of the not-yet-received, prorated fixed fee under each agreement. Due to the dearth of authority on liquidated damages provisions in retainer agreements or attorney-client contracts, this Court analogizes the liquidated damages provisions to non-refundable retainers. The primary conceptual difference between liquidated damages provisions and non-refundable retainers is the timing of the payments. In the retainer agreements at issue, MRT has not been pre-paid the annual retainers. MRT's position would not change, however, if it had received advance payments and qualified them as "non-refundable." In effect, under either theory, MRT still claims entitlement to payments for services not yet (and not to be) performed. This Court will briefly review relevant Oklahoma precedent.

1.  Early Oklahoma Precedent

In White v. American Law Book Co., 233 P. 426 (Okla. 1924), an attorney sought to enforce a "contingency fee" contract against its former client, which had prematurely discharged the attorney without cause.  Under the collection agreement at issue, the client was to pay the attorney a fifty percent commission upon collection of  "$100 at once [from the debtor] or the return of the [merchandise]."[3]  Id.  The Oklahoma Supreme Court held that "[w]hether the contract was fully performed, or defendant was prematurely discharged without his fault, from his employment as to this item, and thereby prevented by plaintiff from fully performing, he was entitled to his fee per contract."  Id.  Disregarding quantum meruit recovery as applied in "some jurisdictions," the court continued:

> The relationship of attorney and client is one of reliance, trust, and confidence.  When any element of this relationship is destroyed, for whatever reason, the client has the absolute right, in the interest of his own welfare, to discharge the attorney.  On such discharge, the fees become due.  It is unnecessary to cite authorities to these propositions.  The rule for the measure of damages, when the discharge is without fault of the attorney, should be [as set forth in the contract], but otherwise under other circumstances.

Id. at 427.  Thus, the court concluded that because the client prevented the attorney's full performance under the contract, the client owed the attorney the full contract fee of $50.  Id. at 426-27.

Later that same year, the Oklahoma Supreme Court decided Roxana Petroleum Co. of Oklahoma v. Rice, 235 P. 502 (Okla. 1924).  The court described the issue as "simple" and summarized the action as a "breach of an attorney's employment contract and for damages resulting

---

[3]     Although White refers to the contract as a contingency fee, in modern terms, the contract would be most analogous to a fixed fee retainer.

8

from the loss of fees in giving up employment by other clients to represent the defendant, exclusively, and for fees earned and unpaid, and fees to be earned in contemplation of the contract of employment." Id. at 503.  The client, a national oil company, retained the attorneys as its legal representatives in 1912.  Id.  In 1918, the company decided to consolidate its in-house legal department with this outsourcing arrangement.  Id.  By agreement, the attorneys took over the oil company's legal department,[4] and the attorneys initially "were given a [$15,000 per annum] retainer for representing all the legal business of the company as well as the larger business matters they had been looking after."  Id.  The attorneys "gave up all their other clients, including an annual fee . . . of about $17,500 a year, and applied themselves exclusively to representing the [oil company]." Id.  In 1919, however, the parties amended their agreement.  Id.  Under the new agreement, the attorneys were to continue representing the company in Oklahoma and Texas matters and were to bill the oil company monthly for their hours of services rendered.[5]  Id. at 503-04.  Shortly after implementation of this new arrangement, the company discharged the attorneys on the ground that the monthly statements were "unreasonable."  Id. at 504.  In response, the attorneys withheld funds collected on behalf of the oil company "as assurance to them that they w[ould] be properly compensated for the [submitted bills and] breach of [the] agreement."  Id.

---

[4]     Based on the language in Roxana, this Court assumes that the contract stated that the oil company would permanently employ the attorneys.

[5]     It is not entirely clear whether the oil company continued to pay the attorneys the annual fixed fee in addition to the hourly compensation.  Because the case states that the attorneys withheld funds that they collected on behalf of the company to ensure payment of certain bills, it is assumed that the new agreement did not require the oil company to pay an upfront, annual fixed fee.

With striking similarity to the modern commentary to Rule 1.16(d) of the Oklahoma Rules of Professional Conduct, the oil company defended its actions by asserting that "a client may discharge his attorney at any time, with or without cause incurring liability only for services up to date of discharge." Id. at 505.  The court refuted the oil company's argument, however, and found that the oil company's proposition did not "apply to a case where the attorney, in entering into the contract, had changed his position or incurred expenses, or a case where an attorney is employed under a general retainer for a fixed period to perform legal services in relation to matters that they [sic] may arise during the period of the contract." Id.  The court found that unlike the facts in the seminal case of the era, Martin v. Camp, 219 N.Y. 170 (1916), in which "only current expenses and definite fees [we]re involved," the attorneys in Roxana had "compromised their claims against the company, changed their position in relation to their general practice, incurred expenses in maintaining an office for the special services of defendant, and were given permanent employment by defendant." Id. (emphasis added).  In conclusion, the court reiterated "that where an attorney enters the services of his client for permanent employment and in doing so changes his position by giving up other clients, and incurs expenses for the purpose of his employment, and is discharged by the client without cause, he may treat the contract as breached and recover damages for the loss of fees provided for in the contract."[6] Id.

---

[6]     The Indiana Supreme Court has noted, albeit indirectly, that many of the same cases cited by Roxana in support of its holding are no longer good law in light of the "contemporary and regulated status of the attorney-client relationship as governed by the Model Rules of Professional Conduct." Estate of Forrester v. Dewalt, 562 N.E.2d 1315, 1318 n.3 (Ind. Ct. App. 1990), cited with approval in Wright v. Arnold, 877 P.2d 616, 617 (Okla. Civ. App. 1994).

In <u>Okmulgee Building & Loan Ass'n v. Cutler</u>, 51 P.2d 709 (Okla. 1935), the Oklahoma Supreme Court returned to its holding in <u>White</u>.[7]  Here, a mortgage company hired an attorney to file sixteen foreclosure lawsuits on its behalf.  <u>Id.</u> at 709.  Under the terms of the parties' agreement, the mortgage company was to pay the attorney "one-half of the attorney's fees provided for in the note and mortgage."  <u>Id.</u>  The attorney alleged that after he had filed the suits, the mortgage company "employed other counsel to complete said suits and refused to pay him the fees due in said action . . . although he was ready, able, and willing at all times to complete the services on behalf of the defendant as contracted for."  <u>Id.</u>  In finding that the attorney was entitled to his fixed fee, the court quoted its Syllabus in <u>White</u>, 233 P. at 426: "Where an attorney is employed at an agreed compensation and fully performs [the specified task] until discharged without cause, the measure of his damages is the compensation named in the contract."  <u>Cutler</u>, 51 P.2d at 711.  The court concluded that the attorney had met "every essential element for recovery."  <u>Id.</u>

Here, if this Court were to view these cases in a vacuum, they tend to support enforceability of MRT's liquidated damages clauses.  But we live in no such vacuum.  The rules governing the legal profession undoubtedly have evolved over the last eighty years.  Accordingly, an examination of modern authority is likewise essential to the analysis.

### 2.  Modern Oklahoma Authority

Oklahoma adopted the Rules of Professional Conduct in 1988.  <u>See</u> OKLA. STAT. tit 5, Ch. 1—App. 3-A, Rules of Professional Conduct.  The current version of Rule 1.16(d) provides that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable

---

[7]     The court did not cite <u>Roxana</u>.  In fact, a Westlaw keycite check conducted on January 22, 2008 revealed that no Oklahoma appellate court has cited <u>Roxana</u> when addressing recovery of hourly fees.

to protect a client's interests, such as . . . refunding any advance payment of fees or expenses that has not been earned or incurred." In re Application of Okla. Bar Ass'n to Amend Okla. Rules of Prof'l Conduct, 171 P.3d 780, 780, 836 (Okla. 2007). The comment to Rule 1.16(d) adds that "[a] client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payments for the lawyer's services." Id. Although Rule 1.16(d) and its commentary are not binding precedent, this authority is relevant to the question here because of a more recent decision by the Oklahoma Court of Civil Appeals.

In Wright v. Arnold, 877 P.2d 616, 617 (Okla. Civ. App. 1994) (released for publication),[8] the narrow issue before the court was "whether a non-refundable retainer fee in an hourly contract for legal services may be retained by an attorney irrespective of whether the attorney renders the contemplated services." The client in Wright retained the attorney to perform legal services for collection of past-due child support. Id. Under the terms of the written retainer agreement, which the client alleged she did not read, the client agreed to pay "$100 per hour for in-office time . . . based upon 15 minute increments, promptly upon receipt of [the] itemized periodic billing." Id. The client further agreed that the $4,000 retainer she tendered at the time of signing was non-refundable. Id. Within two weeks of signing the contract, the client discharged the attorney. Id. At that time, the attorney had spent 22.25 hours on the client's case. Id. The attorney refused to give a refund. Id. The attorney viewed the $4,000 retainer as earned upon receipt and averred that "it was required

---

[8]     According to Rule 1.200 of the Oklahoma Supreme Court Rules, opinions "[r]eleased for publication by order of the Court of Civil Appeals . . . shall be considered to have persuasive effect." While the Oklahoma Supreme Court also denied certiorari in Wright, the Rules further provide that a "disposition of the Oklahoma Supreme Court that denies a petition for certiorari . . . has no precedential effect." Id.

in part to take on the case and to set aside other work previously calendared." Id.  Additionally, the

attorney "viewed it as 'covering actual hours spent and perhaps some expenses.'"[9] Id.

The court began by noting that "[a]lthough the Oklahoma Supreme Court has not addressed

the enforceability of non-refundable retainer fees, both decisional and statutory law give guidance

on how the court would decide such an issue." Id. at 618.  The court summarized the relevant

principles as follows: (1) The "relationship of attorney and client is one of reliance, trust, and

confidence [and,] [w]hen any element of this relationship is destroyed, for whatever reason, the

client has the absolute right, in the interest of his own welfare, to discharge" counsel, id. (quoting

White, 233 P. at 427 (internal quotation marks omitted)) (alterations in original);  (2) Rule 1.16(d)

and its commentary affect the court's analysis, id.; and (3) "[A] contract between a lawyer and a

client for a certain fee 'will not be upheld or enforced where the compensation is so excessive as to

evidence a purpose on the part of the attorney to obtain an improper or undue advantage over the

client.'" (quoting Robert L. Wheeler, Inc. v. Scott, 818 P.2d 475, 480 (Okla. 1991)), id.  In light of

these principles, the court found that "a non-refundable retainer provision in an hourly-rate contract

for legal services is unenforceable.  It is an impermissible restraint on the right of a client to freely

discharge her attorney."  Id.  A discharged attorney "is entitled to only such fees as the attorney can

show are reasonable for the services actually performed."[10] Id. at 619 (emphasis added).  Thus, the

---

[9]     Although this quoted language might indicate that the retainer was, in reality, compensation
both for performance of services and for general availability, the court in Wright viewed the
retainer only as an advance payment for hours of legal service.

[10]    Again, MRT is not seeking recovery for any services performed prior to the termination of
the attorney-client relationship.

13

modern authorities support CITGO's position, at least as to the right to discharge MRT without liability for work not performed.

3.  <u>The Unanswered Question</u>

MRT's retainer agreements present questions of Oklahoma law unanswered by the foregoing precedent.  First, <u>Wright</u> wholly failed to mention <u>Roxana</u>, which ostensibly involved an hourly rate contract for legal representation in specified matters.  Thus, this Court cannot discern whether this case is still good law in light of recent rules of professional conduct and public policy or whether it has been implicitly overruled.  Second, <u>Wright</u> expressly reserved the "issue of enforceability of a non-refundable retainer fee . . . in a fixed-rate contract."  <u>Id.</u> at 619 n.3.  Thus, this Court questions whether <u>Wright</u> governs other types of retainer agreements.  Third, although <u>Wright</u> emphasized the hourly fee nature of the retainer agreement, <u>Wright</u> actually blurred the line between fixed fee and hourly fee retainers: "[a]lthough most cases [from other jurisdictions] address this issue in context of a fixed-fee contract, we believe that the rationale of the decisions has even stronger application in an hourly-rate contract."  <u>Id.</u> at 619 n.4.  These decisions from other jurisdictions involved specific matter, fixed fee retainers, under which the courts limited the attorneys' recoveries to the reasonable value of their services and not the full amounts stated in the contracts.  <u>See</u> <u>id.</u> at 619.  Thus, this Court cannot discern whether the key distinction is the nature of the agreement — i.e., specific matter versus general availability — or the method of accounting — i.e., fixed versus hourly fees.  Fourth, <u>Wright</u> rejected as irrelevant the attorney's argument that "the non-refundable retainer should be enforced because he had to 'immediately rearrange his schedule,' 'set aside other work previously calendared,' and forego accepting a slip-and-fall case."  <u>Id.</u>  Such a rejection invokes the question of whether <u>Roxana</u>'s emphasis on attorney reliance is still good law.  <u>Wright</u> held that

14

attorney reliance, as manifested by availability, is relevant only to a determination of the reasonable value of the attorney's services under <u>quantum meruit</u> recovery — not to the issue of enforceability of the retainer.  Thus, this Court is unable to identify the weight to be given to attorney reliance.

### 4. <u>Other Jurisdictions</u>

Other jurisdictions are split as to the enforceability of non-refundable retainers.  Many courts analyze the issue in terms of whether the parties intended the retainer to be for general or "special" purposes.[11]  The modern view is that special, non-refundable retainers are unenforceable, and, thus, an "attorney's remedy is limited to recovery of the reasonable value of his or her services rendered before discharge on the basis of <u>quantum meruit</u>."  <u>Dawalt</u>, 562 N.E.2d at 1317-18 ("A [fixed fee, special] retainer provision which requires a client to pay for legal services in advance, and which permits the attorney to retain the advance payment irrespective of whether the services contemplated are rendered, necessarily has a chilling effect upon a client's right to freely discharge his attorney."); <u>see Ryan v. Butera, Beausang, Cohen & Brennan</u>, 193 F.3d 210, 216 (3d Cir. 1999) (applying Pennsylvania law and noting in <u>dicta</u> that a "special or specific" retainer "remains the client's property if the contemplated services are not provided."); <u>Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Apland</u>, 577 N.W.2d 50, 57 (Iowa 1998) ("As to [special retainers], we hold [these] fees are refundable notwithstanding any agreement to the contrary . . . ."); <u>Olsen & Brown v. City of Englewood</u>, 889 P.2d 673, 676 (Colo. 1995) ("To allow an attorney to recover damages for services not actually rendered [pursuant to a non-refundable, fixed fee, special retainer] . . . would

---

[11]     The Oklahoma Bar Association does not use the word "special retainer," but instead refers to agreements which govern "specific matters."   <u>See</u> Topic: Non-refundable Retainer Agreements, 2002 WL 31990267 at *1-3.  It appears that the terms "special" and "specific" are interchangeable.

penalize the client in direct contravention to the client's absolute right [under Rule 1.16(d)] to

discharge the attorney."); Jacobson v. Sassower, 474 N.Y.S.2d 167, 169-70 (N.Y. App. Term 1983)

("[A] 'nonrefundable' [hourly fee] retainer may be viewed as a mechanism for liquidating damages

for discharging an attorney at the amount by which the payment made on account exceeds the actual

value of legal services rendered. . . .[And] [s]ince . . . a client will not be cast in damages for

discharging his attorney, imposition of damages in the form of a forfeited payment on account is

unacceptable.").   As to hybrid agreements, however, no view predominates across jurisdictions.

In Kelly v. MD Buyline, Inc., 2 F. Supp. 2d 420, 426 (S.D.N.Y. 1998), for example, the

corporate client and attorney executed a retainer agreement, which provided that the attorney would

perform legal services as needed by the client for a three-year period.  The client agreed to pay

annual fixed fees, payable in equal monthly installments.  Id.  Prior to expiration of the contract,

however, the client discharged the attorney.  Id. at 443.  The attorney sued the client for the full

value of the remaining two years of the engagement term, claiming that the contract "was a three-

year 'general' retainer agreement," which the client had breached without cause.  Id.  The court

began by noting that the "courts of New York and most other jurisdictions have long held that

retainer contracts between attorneys and clients are subject to special rules that are an outgrowth of

the attorney's role as a fiduciary and as an officer of the court."  Id. at 444.  Accordingly, the court

found that if a retainer agreement violated ethical rules and was contrary to public policy, courts

would not ordinarily enforce the agreement under contract law.  Id. at 448.

The court made several additional significant findings.  First, it found that to the extent the

agreement at issue qualified as a general retainer, refundability did not turn on the "earned when

paid" justification, i.e., the attorney's recovery did not depend on "whether payment ha[d] already

16

been made." Id. at 449-50.  Second, to the extent the retainer qualified as a hybrid agreement, the court disagreed with the commentaries of well-known academics.  The court reasoned that the enforcement of a hybrid retainer should not "be subject to close scrutiny [or] governed by a rebuttable presumption that any monies retained by counsel are for services rather than for availability."  Id. at 450; but see Apland, 577 N.W.2d 50 at 57 (Iowa 1998) ("As to hybrid cases, we will presume that no part of the retainer was given for availability as that term is used in the general retainer context. . . . The attorney will have the burden to rebut the presumption by a convincing preponderance of the evidence."); Nonrefundable Retainers Revisited, 72 N.C. L. Rev. at 26 (advocating a rebuttable presumption of invalidity).  The Kelly court further reasoned that, under New York case law, hybrid retainers should not be unenforceable. 2 F. Supp. 2d at 450; but see Lester Brickman & Lawrence A. Cunningham, Nonrefundable Retainers: A Response to Critics of the Absolute Ban, 64 U. Cin. L. Rev. 11, 22-23 (1995).  Third, the court determined that the hybrid retainer at issue in Kelly could be enforceable, because "a court could presumably make an allocation of the fee and order recovery of so much of it as would reasonably reflect the attorney's commitment to be available for the client, as distinguished from the amount that may be allocable to anticipated services."  2 F. Supp. 2d at 451.  In essence, Kelly extended the fact-intensive quantum meruit analysis to hybrid retainers.

Other courts have arrived at contrary conclusions.  The Georgia Supreme Court determined that a seven-year hybrid retainer, containing a provision that essentially constituted a million dollar liquidated damages clause, was unenforceable.  Aflac v. Williams, 444 S.E.2d 314, 315-17 (Ga. 1994).  The court found that the "obligation to regulate the legal profession in the public's interest causes us to favor [the client]'s freedom in ending the attorney-client relationship without financial

17

penalty over [the attorney]'s right to enforce the damages provision in his retainer contract." Id. at 316-17. The hybrid retainer was unenforceable because "the contract improperly impose[d] a penalty by requiring [the client] to pay damages equal to half [the attorney]'s retainer." Id. at 317. A New York appellate court, on the other hand, concluded that a two-year hybrid agreement was not per se unenforceable. Atkins & O'Brien L.L.P. v. ISS Int'l Serv. Sys., 252 A.D.2d 446, 447-48 (N.Y. App. Div. 1998). In reaching this conclusion, the court applied two "traditional" exceptions to the general rule that a client has the right to terminate the attorney-client relationship at any time and for any reason.[12] Id. at 448. Under the first exception, the agreement could be enforceable because the corporate client employed its former in-house counsel "under a general retainer for a fixed period to perform legal services in relation to matters that m[ight] arise during the period of contract." Id. Under the second exception, the agreement could be enforceable because the attorneys established "significant detrimental reliance on the promise that the parties' agreement would continue at least through 1996." Id. at 449. The New York court concluded that the attorneys could sue for breach of their retainer agreement. Id.

In sum, many jurisdictions have found that special, non-refundable retainers are unenforceable and, thus, an attorney's recovery is limited to the reasonable value of his or her services. As to the enforceability of hybrid retainer agreements, however, this Court finds that there is no predominant cross-jurisdictional view.

---

[12]      These "traditional" exceptions mirror the exceptions set forth in Roxana. See discussion supra Part II.B.1.

### 5. Certification

MRT's breach of contract claim hinges entirely on whether, under Oklahoma law, the liquidated damages provisions in the retainer agreements are enforceable.  In seeking to answer this question, this Court has examined relevant Oklahoma case law and the Oklahoma Rules of Professional Conduct.  This Court has also examined case law from other jurisdictions and related supplemental authorities.  Nevertheless, this Court concludes that there is no clear answer under Oklahoma law.  As set forth in OKLA. STAT. tit. 20, § 1602, the Oklahoma Supreme Court may answer a question of law certified to it by a United States court if the answer may be determinative of an issue in pending litigation and no controlling authority exists.[13]  Therefore, this Court will certify the following question of law to the Oklahoma Supreme Court: whether liquidated damages provisions in fixed fee, fixed term retainer agreements between attorney and client are enforceable under Oklahoma law.  The Court directs the parties to confer and to agree on the language of proposed certified question(s) no later than January 28, 2008.

### III. Conclusion

**IT IS THEREFORE ORDERED** that CITGO Petroleum Corporation's Motion for Judgment on the Pleadings and Memorandum in Support (Dkt. # 30), as well as Plaintiff's Motion for Summary Judgment (Dkt. # 44) and Defendant's Cross Motion for Summary Judgment ((Dkt. # 48), will be **held in abeyance** pending a response to the Court's certified question(s) to the Oklahoma Supreme Court.  The parties are ordered to jointly submit proposed certified question(s) no later than **January 28, 2008**.

---

[13]     The statute provides that such controlling authority includes decisions of the Oklahoma Supreme Court, Oklahoma constitutional provisions, and Oklahoma statutes.  Id.

19

**IT IS FURTHER ORDERED** that all remaining dates in the scheduling order, including the pretrial conference set for March 6, 2008 at 9:00 a.m. and the jury trial set for March 31, 2008 at 9:30 a.m., are hereby **stricken**.

**DATED** this 22nd day of January, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT